Good morning, Your Honor. May it please the Court, Scott Street representing the petitioner, David Bagdasaryan. Actually, before I begin, I know I only have ten minutes, but I would like to, if possible, reserve two of those for rebuttal. I have a couple questions for you. Yes. Some of the inconsistencies seem like they could be innocent, but it's hard to imagine a guy who at one time says his tooth was pulled out with pliers, and at another time says that while he was in custody, he broke his tooth. Pretty memorable if somebody is torturing you by pulling your tooth out with pliers, but it's not that uncommon for somebody to break a tooth by falling or something of that nature, maybe even by getting punched in the mouth. How can he be credible with that kind of inconsistency? Well, I think, Your Honor, first of all, you have to look in context at the nature of the questioning, what questions Mr. Bagdasaryan was being asked, how he was answering them. Did he say at one point that he broke his tooth while in custody, and at another point that his tooth was pulled out with pliers? Well, he said at one point, Your Honor, he did say that his tooth was broken in describing the injuries that he suffered, and at another point, you're correct that he said specifically that his tooth was removed with pliers when he was describing specifically what the guards had done to him while he was in custody, but I don't think those... Why doesn't that inconsistency make a liar of him? Well, I think, Your Honor, it's not... the statements could be interpreted as an inconsistency, but looking at the nature of the testimony, looking at the questions Mr. Bagdasaryan was being asked, I would argue in that context, the statements weren't actually... Explain how. I mean, if you say, well, you have to take it in context, I still don't understand how the context makes it understandable and perhaps honest. Well, I think in this context, Your Honor, it could be that Mr. Bagdasaryan, when he had suffered the specific physical harm he had suffered to his body while he was in custody in Armenia, while later on, he was testifying as explicitly to what the government had done to him. So I think in that sense, the two statements are... Okay, let me ask you about my other concern. On his well-founded fear, when I read about the bad things that had happened to him, it looked like a guy who lives in a place where there's a lot of corruption. So whenever he's making any money at any kind of business, someone with connection shakes him down. That's not one of the five categories that the statute provides for asylum for. Way of the world, probably, and much of the world. Right. How do you get your well-founded fear on account of one of the five categories out of that? Well, first of all, Your Honor, I would agree, and I think that's something the immigration judge picked up on, is the fact that the economic policies that Mr. Bagdasaryan was opposed to... Wait a minute. You just said something different from what I said. Economic policies he was opposed to were quantitative easing round two. He was opposed to crooks with connection shaking him down. That's not exactly a policy. It's just corrupt conduct. Well, I think Your Honor, that's what's... And being opposed to it is not the same thing as writing an op-ed about how you think quantitative easing round two is going to generate inflation. It's just... I don't understand how you get politics out of it, or political persecution on account of political opinion. I think the way you get politics here, Your Honor, is that Mr. Bagdasaryan didn't simply believe that this activity was corrupt and was bad, was bad for the country. He took that to the next level, and he specifically said, and actually said consistently throughout his testimony, throughout his written application, that he then took that to the next level. He went and met with government officials. He went and petitioned the government. He organized rallies of similarly situated people to oppose these policies. And did anything bad happen to them, or did the government just ignore them, and corrupt people kept shaking them down? Well, corrupt people kept shaking him down, Your Honor, but they were shaking him down not because of simply his disagreement with the policy, but with his exercise of political rights, rights to organize. I thought they were shaking him down before that, just because they wanted money. Well, but before that and after that, Your Honor, because Mr. Bagdasaryan said consistently that he organized these protests in May of 2000, April, May of 2000, and he was arrested, specifically arrested and detained for nine days at the very end of June of 2000, the first week of July 2000. Counsel, I have a different set of questions on another topic, and that has to do with the ineffective assistance of counsel claim. What effect does it have on your claim that the petitioner did not follow all the steps required in matter of Lozada? Well, first, Your Honor, as we noted in our first brief, Lozada is a board immigration appeals ruling that was adopted initially to govern the board's review of motions to reopen and I think was viewed as a way of sort of rooting out clearly frivolous, unmeritorious claims of ineffective assistance of counsel. This court has never said that it should be used to bar a constitutional claim. It has said that it will look to those same factors to determine whether or not, determine the quality of the claim. And in this case, I would say that the, so first of all, I would say it doesn't bar this court's consideration of that constitutional claim. Secondly, I would say that to the extent the court does consider Lozada, Mr. Bagdasaryan did put into the record a description of his agreement with his attorney in the immigration courts and did describe, and in addition, the arguments we made about the attorney's ineffectiveness here are, you know, can be seen from the record on its face. If we were to agree with you about the ineffectiveness claim, would we reach the adverse credibility finding or would that be unnecessary? I don't think you would have to reach the adverse credibility finding, Your Honor, because the court could simply reverse on that ground and remand the case back to the immigration court for a new proceeding, which I think would be the most fair thing in this case. But I think that the adverse credibility determination and the inconsistencies that the court purported, seeming inconsistencies that the court was mentioning earlier, have to be used to look at the quality of, to fully analyze the quality of Mr. Bagdasaryan's attorney's performance because I think if she had done really a minimal amount of preparation, those inconsistencies could have been resolved in the first instance. That seems to be pretty clear from the record. Is there anything in the record about the, about translation? Does the petitioner speak English at all? Your Honor, the petitioner speaks a bit of English. I believe that was mentioned in the record at one point, that he speaks a bit of English. I'll let you testify. It sounded, from the record, it sounded like there may have been some botched translation as well as some very unfortunate questions asked by an incompetent notario or whatever she was that has been much criticized in other cases. Yeah, I agree, Your Honor. I think that the, Mr. Bagdasaryan does speak a limited amount of English, but he was attempting to translate through an interpreter, I think, given the importance of the proceedings. That was warranted, but as the record reflects, at one point, the interpreter noted that there was a very, the Armenian words for June and July are very similar, you know, and so forth. And given the nature of the questions that the attorney was asking, these very general questions that required that Mr. Bagdasaryan simply basically recite his story based on his memory of it, it led to the proceedings being fundamentally unfair. You have a little more than half a minute remaining, if you'd like to say. I'll reserve that for my rebuttal, Your Honor. Thank you. We'll hear next from the government. May it please the Court, Tim Ramos on behalf of the United States Attorney General Eric H. Holder, Jr. This immigration case, the Board of Immigration Appeals, dismissed Mr. Bagdasaryan's appeal of the Immigration Judge's decision denying his applications for asylum. Could you speak a little more slowly? It's a little hard to follow you. I do that. Counsel, I have a question for you. You know some of my concerns for the other side. A concern I have for your side is he says he organized this public rally or demonstration and then he got arrested and that he got beaten to the point where he needed extensive medical care, which he had medical records for, as a result of the demonstration. Why isn't that enough for past persecution? Well, there never was a merits determination in this case, actually. This is a pure credibility finding, and the merits never before the Board either, and therefore not before the Court. There was no past persecution or well-founded pure persecution finding in this case. The credibility determination looks as though it gets us unavoidably into the ineffective assistance claim because the credibility was in significant part based on lack of corroboration, and he says he gave the corroboration to his lawyer. It was all translated, and she just didn't pay attention or forgot about it and didn't put it on. Well, if we'd like to address the ineffective assistance of counsel claim, we can do that before going into adverse credibility. Yes, please. That's what you've just been asked. So on the merits of the ineffective assistance of counsel claim. Could you talk a little slower? It's hard for me to understand you. Okay. On the merits of the ineffective assistance of counsel claim, about corroborating evidence in particular, there's two preliminary hearings before the two merits hearings in which he testified, which Gail Herrera, former counsel, and Mr. Bagenstein, and the immigration judge, had discourses about the need for corroborating evidence. It talked about the particular documents he would need, such as a charging document or medical records, and as well as further evidence of the appearance he claimed to have made on an Armenian television show, among other documents. He stated he could obtain these documents in just more time, and the immigration judge granted multiple continuances to obtain documents such as the medical records, and he was never forthcoming with these documents. He claimed, it was never said that that was one of the documents that wasn't translated. His attorney said that he kept bringing forth documents that were partial translations. Mr. Bagenstein explicitly notes in his own testimony in the preliminary hearing that he knew he needed to bring forward better translated documents, even more corroborating evidence, when the immigration judge asked him why he had only submitted partial translations or why his attorney kept stating that. Doesn't that just prove the point that his lawyer was ineffective? If the immigration judge told the lawyer, you have to get this information, and the lawyer understood that, or should have understood that the information was required and had to be translated, that seems to me to just be the heart of ineffective assistance right there. Well, Ms. LeRaire, in the preliminary hearing, states that she's had a lot of mail communications with him, phone calls and meetings with him, and they've had many problems obtaining this evidence. It seems to be from the transcript that she had problems getting Mr. Bagenstein to act on these things. Well, from the transcript, it also appears that she acted in a way that was rather aggressive towards her own client. It just, it was the strangest, well, not the strangest, that's probably an exaggeration. It was a very peculiar direct examination. It just seemed to me that the record shows a very, very bad lawyer, and I guess I'm not sure how bad the lawyer has to be to reach the level of ineffective. Well, as we previously discussed with opposing counsel, there is a procedural prerequisite that they failed to address here. Even if the ineffectiveness is plain on the face of the record? That is the court's jurisprudence. If it's plain on the record, then you can bypass certain of the ZADA requirements, but we submit on the government's behalf that it's not plain on the record. The testimony that you find peculiar is three hours of direct testimony where she asks him question after question for three hours, and he claims that because she failed to ask him particular types of questions, that accounts for certain omissions or inconsistencies. So that's three hours of direct testimony where she asks him the what, when, who, and where, and how of his accounts in Armenia. And also further direct testimony in the hearing on November 2004, which is coupled with cross-examination thereafter. In particular, he cites, as examples of ineffective questioning in the opening brief, there's two pastors he cites, and they both deal with a discussion about Officer McKeon, an alleged member of the Internal Affairs Department who he had a, it was a time application he claimed he was beaten and imprisoned for several hours by Officer McKeon. In his direct testimony, which went on for three hours as I previously noted, he talked about Officer McKeon on multiple occasions. She asked him what he talked about with Officer McKeon, how it came up, and how long, just general questions about what happened with Officer McKeon. He never pro-offered the fact that he was beaten by Officer McKeon, and that's no mission that the Immigration does rely on to make its adverse credibility determination, which now claims it's the fault of improper questioning. But if you look at that transcript, portions that he cites, she asks him a bevy of questions about his encounter with Officer McKeon, and that's their prime example of ineffective assistance as far as questioning goes, which is not pointed out by the record. So is there any further questions on the ineffective assistance of counsel claim? Well, I'd like to add one more thing. They also note that she in fact prepared for the case. Well, this is one of the things that Matter of Lizada is meant to address, because it gives one of the requirements that allows the attorney an opportunity to respond to the claims against her. And if one of the claims is that she inadequately prepared for the hearing and did not know the case as well, this is one of those instances where the attorney could rebut that claim, showing evidence that she did prepare for the case somehow, or records of the time she spent doing it. You make it sound like it's an adversarial proceeding between the asylum applicant and his lawyer, but really the question is simply the fact whether if the performance was really, really terrible, the person didn't get what they paid for and what they were entitled to, which is a minimally competent representation, and whether, you know, so I guess I have a hard time seeing why it's, why you make it sort of something between the person and their lawyer. Well, at the point the claim is made, there of course is going to be something adversarial between the lawyer and client. When they accuse the lawyer of ineffective assistance, the lawyer is going to become herself in this case. She never had a chance to defend herself or explain why the claims were baseless. All we have is a mere accusation by Petitioner Mr. Baggistani. But we have the record. We have the record, and I went through the transcript, the pages that they cite and the questionings they cite, and that's what I was trying to explain. We have more than that. What? We have more than that. We have the medical records themselves. That was submitted to the board. Let me tell you what's on my mind, and then you can address it specifically. It was critical to believing him from the IJ's point of view that there would be some corroboration. The critical corroboration would appear to be his medical records. In fact, he had medical records, and they're quite dramatic. It really shows they beat the living daylights out of him and broke his jaw and breaking somebody's jaws. It's hard to do, and it's very serious, and there's some other real serious stuff in there. It's hard to see how those would exist and be translated unless they'd been obtained and translated, and his lawyer didn't put him in. It's hard to understand why she didn't and how that can be anything other than ineffective assistance. Well, that is only one medical record, first of all. He said he also had a medical record of the state of the hospital after he was stabbed. Well, I read a medical record here, and let's see if I can find it again. It was the one I was telling you about with the broken jaw and all. It was a pretty good medical record. Yeah, I'm going to persuade you that somebody beat the living daylights out of him. It's also worth noting in that medical record, it states that he had multiple broken ribs. Ribs 5 through 8 were broken. Take a look at 42. That's what I was looking at. Right, and it's worth noting, just as far as the average credibility determination goes, that at one point he tried to, Mr. Begstarne explained in his appeal brief that he was being asked what injuries he was treated for, and that's why he did not mention the rib that he was hurt. And in fact, the medical record shows that he was treated for a rib injury. Actually, a broken rib isn't that big a deal. I mean, I've had that. It means it hurts to breathe and laugh and cough for a few days. It heals itself. You don't even get much treatment for that. Well, there's four broken ribs in that medical record. Then it hurts four times as much. I would say that hurts substantially more, I think. So he didn't minimize his injury. I mean, he actually minimized his injuries by saying that. He didn't exaggerate them. It was inconsistent with this document he submitted later on. And it was also inconsistent with his previous testimony, where he did not talk about the rib injury whatsoever. But anyway, as far as the document goes, this was submitted, of course, after the immigration judge proceedings to the board, which the board did not consider it because it was extra record evidence at that point. And there's no indication in the record that this was evidence that was around at the time of the immigration judge. He could have obtained it after his proceedings, and therefore it was something he did not give to his former counsel, Gail Herrera. He claims, of course, he did. But there's no evidence, no date stamp saying when he received that in the mail. Well, there is kind of evidence. It's so burdensome and expensive to get something translated and notarized, it's hard to imagine any inference other than that he gave it to his lawyer. Let's assume that he got it for his lawyer and gave it to her. Yeah, let's assume this is one of the untranslated documents. Well, here's the thing. I'm sorry. Sorry. I was just going to point out that the affidavit of translation on transcript 39 is dated in March of 2004, and the hearing took place in June of 2004. So on its face, the translator, at least, has prepared this document ahead of time. So it seems to me on its face it demonstrates corroboration of the corroboration that he would have given it to his lawyer before the hearing. But this is only one document. There is other documents that he could corroborate his claim with. But when you're dealing with credibility, one significant document that says this person was badly beaten exactly on the day when they said and received this treatment could really change things, could it not? Not with the other inconsistencies and omissions of the record or reasonably support the adverse credibility termination. With this one corroborating evidence, like I said, it does not consistently support his claim because it mentions multiple broken ribs that he did not testify to and that he was inconsistent with his previous testimony where he omitted mentioning the rib. So while it does constitute, he could claim it is corroborating evidence, even though it wasn't before the IJ. It does not make his testimony consistent. It does not rehabilitate anything. Therefore, the adverse credibility termination still stands on its own merits regardless of any claim of ineffective assistance of counsel. Thank you, counsel. Oh, I'm sorry. Go ahead. No, I was just going to. If you have more questions, please continue. I was just having trouble squaring what you said with the record that says fracture of five through eight ribs, Roman numerals, identifying this rib five, six, seven, and eight, the four fractured ribs. What's the problem with that? Well, he only stated in his cross-examination testimony I had a rib broken. Oh, and actually you had four ribs broken. Yes. And he previously did not mention the rib injury whatsoever. So it seems significant at that point if he had multiple broken ribs, he would have, one, mentioned it on direct testimony, or, two, mentioned multiple broken ribs when he mentioned it on cross-examination. Thank you, counsel. We appreciate your arguments, and you may have a minute for rebuttal if you'd like. Your Honor, Mr. Ramnett said something. He said that there was no merits finding in this case, and I would direct the Court specifically to page 247 of the administrative record where the immigration judge, when he was issuing his oral decision,  and that if he believed Mr. Bagsarian's story, then he obviously had been persecuted based on his political beliefs and would be entitled to withholding of removal and a discretionary grant of asylum. I want to ask you about the problem with common law. If you showed up in court with a bad lawyer, that's just too bad for you. It's not the government's fault. What's your best case that the fairly egregious This record makes a fairly egregious case for an incompetent lawyer, or at least an incompetent performance by somebody who claimed to be a lawyer. What's your best case that permits a reviewing court to reverse because of incompetent counsel? Because the government didn't produce the incompetent lawyer. Right. Right. Well, I think, Judge Goodwin, I don't recall off the top of my head a single case. I know there was one we cited in our brief about ineffective assistance of counsel, generally because in this context it is difficult to show ineffective assistance of counsel. But I would say that given the importance of the adverse credibility determination here, given the minimal duty of competence that Mr. Bagdasarian's attorney owed to him, and given, as you yourself noted earlier, the importance of the slight inconsistencies in the testimony here, if Ms. Guilherrera had gone out and had these documents translated so they could corroborate Mr. Bagdasarian's testimony, had called his wife to testify to corroborate the story, the immigration judge said at one point that Mr. Bagdasarian didn't produce any evidence to corroborate his appearance on the July 22nd television program. And, in fact, in the record, and we cited to this, there is an affidavit from the television station manager on the television station stationary that's translated that says he did appear on that date. If she had known that, if she had been familiar with his case, she could have addressed those purported inconsistencies that the judge saw. Thank you, counsel. Thank you. The case just argued is submitted. Thank you for taking the case. Thank you. We do appreciate both counsel's arguments, and they actually were quite helpful. And the case is submitted.
judges: Goodwin, Kleinfeld, Graber